171092 U.S. v. Edgar Calazo-Rivera, 171314181076, 181528 U.S. v. Giovanni Varesen-Cruz. Thank you. Mr. Drake? I'm sorry, Ms. Drake. Good morning, Your Honor. I'm going to ask you a question that I'm going to ask all the other counsel. After our order remaining part of this case of Brady issues, what do you understand is still left to be decided by the court at this time? Your Honor, we have several issues on appeal which are ripe for review. I would like to address two issues in particular, the judicial misconduct requiring a new trial when the trial judge intervened into the proceedings and commented on the credibility of the defense witness. Additionally, Your Honor, I would like to address the issue of prosecutorial misconduct requiring a new trial when the government elicited testimony which had been precluded in limine. And that happened several times throughout the trial and there was a resulting mistrial motion. So that is on appeal as well. Before you get started with those issues, since this court issued its order, do you have any updates? I guess I'm trying to figure out, has the government turned over anything in response to your request as of yet? It has not, Your Honor. The defense investigation has proceeded as to the undisclosed Brady material that we believe exists. We have corroboration from independent investigation and disinterested third parties confirming that there were in fact undisclosed confidential informant agreements that clearly would have been impeachment material as to the two cooperating witnesses who testified at trial. That was the subject of three post-trial motions that we filed before the district court requesting disclosure of those very agreements. We still have not received production of the six-page document that was discussed at the ex parte sidebar that we referenced in our brief. But apart from that, no, we have not received those documents. Thank you. You can exclude the time that she has taken to answer that from the time she has for arguing. And you can do that with the other counsel that asked the question also, please. Yes, Judge. Thank you. Thank you, Your Honor. May it please the court, Samantha Drake, on behalf of Mr. Giovanni Verracine, Judge Torea, if I could please reserve one minute for rebuttal. You may. Thank you. Your Honor, this was an 11-day trial that resulted in eight mistrial motions. Any one of the issues on appeal standing alone is sufficient for reversal for new trials. In accumulation, the volume, severity, and repetition of the errors and misconduct below preclude any notion of a fair trial. But the real thrust of Mr. Verracine's argument and what we hope this court will evaluate is the interplay between the overlapping and complementary instances of prosecutorial misconduct and judicial misconduct. And the special prejudice that results when prosecutorial misconduct is either facilitated or ignored or even exacerbated by the trial judge. So I would like to focus on the two issues I advanced to the court, turning now to the first issue, the issue of judicial misconduct. The question before the court is whether it was an abuse of discretion to deny the motion for mistrial that followed the trial judge's comments on defense witness Jason Davila and the relevance of his testimony and the cross-examination of both defense witnesses. Now, the Sixth Circuit has evaluated practically identical language. In this case, the trial judge announced in the presence of the jury that the testimony of Jason Davila is not relevant in this case. In United States v. Daniels, the trial court said practically the same words, quote, all of this is irrelevant to start out with. And the Sixth Circuit found that that statement created an appearance of bias that so undermines the verdict and required reversal. So the Sixth Circuit's analysis in Daniels is applicable here and warrants the same remedial action. This circuit and this panel have addressed very similar types of intervention and statements by the same trial judge in the past. In United States v. Santana Perez, that case was on plain error review, but this court took the opportunity to state that the same trial judge skirted dangerously close to the line in signaling his disbelief of defense witness because the questioning was targeted at highlighting perceived gaps and inconsistencies and casting doubt on the defense. We submit- Could you give me a little bit more context? So Mr. Davila-Reyes had testified on direct. That's correct, Your Honor. And so this was in- so the court started intervening on cross- On cross-examination. When the government asked where did he get the drugs from, where did he get his drugs from. That's correct. And the- I think it's particularly notable that the trial judge made his statement in response to the defense objection. So- You objected to that question about where he got his drugs from as being irrelevant in the context of this case. That's correct. Excuse me. Counsel, I would appreciate if you discontinue your body language. Thank you. That's correct, Your Honor. The objection that defense counsel made was to the relevance and scope of the government's questioning. And I think it is of particular note that the trial judge did not sustain the objection. Instead, he required the defense witness to answer the question about the supplier of drugs and commented again in front of the jury that the- Jason Davila must have gotten his drugs from somewhere unless he, quote, grew them up in his own backyard. So we submit that that is the type of questioning that indicates a skepticism of the defense witness's testimony and, by extension, a repudiation of the defense theory. So if I may, Your Honors, move to our second issue, prosecutorial misconduct. Wait a minute. So is this- I just want to get this straight. So Davila Reyes is also the one who was testifying about being approached in jail. Is that correct? That is correct, Your Honors. And I think that in order to understand the context of Jason Davila's testimony- Your defense theory was that this story about your client was manufactured and Davila Reyes could give relevant information that supported the notion that these people concocted a story. That's correct. He was a critical witness for you. And it is of particular note that his testimony repudiated the testimony of the two cooperating witnesses, which were the only evidence against Mr. Veristein. There were 13 law enforcement witnesses that the government presented who did not implicate Mr. Veristein in any way. So the cornerstone of the government's case was the credibility of these two defense witnesses, and on direct examination, Jason Davila testified that they had motive and opportunity to coordinate and fabricate their testimony, that at the very least, Diego Perez Colon, who was one of the cooperators, was being paid by Junior Capsula to do exactly that, and that Diego offered Jason Davila the same deal, to fabricate testimony in order to implicate people who were associated with a competing drug trafficking organization of Junior Capsula. So this was absolutely a critical defense witness, and the judge's questioning was clearly targeted at impeaching his credibility, encouraging an adverse character inference because of his prior conviction, and repudiating that defense theory. So moving to our second theory, our second issue, prosecutorial misconduct, in this case, the trial judge made a ruling in limine that the government disagreed with. He ruled that there shall be no mentions of murder by any co-defendant in this case, and that the government should instruct its witnesses accordingly. Mr. Varusteen relied on that order. At that moment, he released his demand for the corresponding discovery, which had not been provided, that purported to support the government's allegations of unindicted and unproven murders. He forwent his opportunity to argue the 404 weighing analysis, and also his objection that these acts were not notified pursuant to the 404B notice requirement. However, during the testimony of the first cooperating witness, the government proceeded to elicit exactly that testimony, which had been ruled excluded. And I think the abuse of discretion on the part of the trial judge was allowing the government to do that without notifying its intent to proceed in this direction, or affording Mr. Varusteen the notice or opportunity to be heard. And of particular note is the fact that nothing had changed between the limine ruling and the moment when the government began eliciting this testimony. So the government did not articulate a theory of admissibility. All right, so hang on just one second. So in reading the record, I think the court made a pretty clear ruling about the nephew. I can't remember his name. Maynard. Maynard. But the court really didn't give you a ruling on the colonel, on the admissibility of the evidence about the colonel and him being an unindicted? Well, what the trial judge said is that there shall be no mention of any murder. And then when the government proffered its theory of admissibility as to the colonel, the response of the trial judge was, we'll cross that bridge when we get to it. Which is an overruling. Well, so when you look at the transcript, when defense counsel objected for the first time, there was a sidebar exchange regarding the admissibility of testimony about the attempted murder of Colonel Amado. And the trial judge himself referred to the limine litigation. I see that my time is up. If I could just finish that answer. He himself referred to that as a ruling. He said, that was my ruling on Friday. So the holding of the court in limine was that there shall be no mention of any murder. Our submission is that if something had changed between the limine litigation and the moment in which the prosecutor intended to elicit that prohibited testimony, there was a requirement of that Mr. Verasine be granted the opportunity to litigate that issue outside the presence of the jury and conduct the 404 weighing analysis. Thank you. Thank you, your honors. Ms. Essington, good morning. Good morning. Catherine Essington on behalf of Mr. Raimondi. I'd like to reserve one minute for rebuttal, please, your honor. You may. Thank you. Per our agreement, I will be discussing the issue of – I'm sorry. Excuse me. I forgot to ask my question. In view of the order of the court, what is left of this case as far as you're concerned? The issue that I will be addressing, which is the judge's quashing of the subpoena for Agent Carr-Escuza, I think is likely to arise on remand or retrial in this case and is also an independent basis for this court to order a new trial. So I think this issue would survive the court's ruling. Okay. Thank you. You may proceed. Again, I'm addressing only the issue with respect to Agent Carr-Escuza. The standard of review here for the quashing of the subpoena is an abuse of discretion. However, because this infringed upon the defendant's Sixth Amendment right to compulsory process, it is the government's burden to prove that any error was harmless beyond a reasonable doubt. And this is, in fact, a constitutional rather than an evidentiary issue. So were you able to use the agent's notes during cross-examination? No. For the most part, I think, actually, totally, the defense lawyers were prohibited from questioning witnesses, either the other agents or the cooperating witnesses, about Carr-Escuza's notes because any time they attempted to do that, the judge intervened and made statements such as, you can't ask him about that. He doesn't know what cards he wrote. Those aren't his notes. So they were completely prohibited from asking about those notes and were unable to elicit that testimony from other sources. So you weren't able to use those notes to impeach credibility of witnesses? That's correct. As the rule permits. That's correct. They were unable to use those notes and to conduct the impeachment, which they would have been able to do, had Carr-Escuza been summonsed to testify. Do you agree that if they had been allowed to use his notes to impeach during the cross-examination of the witnesses, then Carr-Escuza would not have been permissible to bring him in independently? Or does it depend upon whether you're saying that it depends on the nature of the denial? Yeah, I think it would depend on the nature of the denial. I mean, for instance, two of the cooperating witnesses, Marrero and Perez, testified or denied in their testimony that they told Carr-Escuza that Mr. Raimondi was Eldon's brother. And so the defense lawyers were unable to impeach him or impeach them. They just simply denied that they had made those statements, and the defense lawyers were unable to show otherwise. I think one of the arguments we'll hear is that let's look at the case. If we exclude, if we only look at corroborated testimony by the cooperating witnesses, plus the other evidence not in the form of cooperating testimony, how strong was the case? In other words, how important was the uncorroborated aspects of the cooperating witnesses' testimony in this case? Extremely important. I would suggest, as did Ms. Drake, that the case against my client and the others rested solely on the testimony of the cooperating witnesses, and there was very little, if any, in the way of corroboration by independent facts or other testimony. And I see my time is up. Unless there are any questions, I will reserve my time for rebuttal. Thank you. Mr. Olmo. Good morning. Good morning, Your Honor. Jose Ramon Olmo on behalf of Mr. Collazo Rivera. And to your question, Your Honor, I'm going to argue about insufficiency of the evidence, which is besides a great issue. Thank you. Each of you are saying what you're going to argue, but I think the question being put to all of you, as I understand it, is what issues still remain for the court? Are the two the same? In other words, are the arguments that you're making today covering all the issues that you understand remain before us in the wake of the remand? Besides the one already argued by the counsel, because I share my minutes with them. Yes, all counsel. Are all counsel collectively covering all issues that counsel believe are left before us? This one is individual, only applicable to Mr. Collazo Rivera as to the insufficiency of the evidence as to his guilt. I guess, and I've been remiss and I apologize to your sister counsel, but I guess we're trying to figure out how intertwined is the Brady issue to all of the issues. And are these issues, which everyone is arguing is independent of the Brady issues, are these totally stand-alone issues or do we need to have a resolution of the Brady issues to be able to make a determination of these? I believe on the Rule 29, insufficiency issue, you can decide it without the Brady. Okay, so that's your position? Yes. I know our case law generally says that, but in this particular instance, I wasn't sure if you were still saying that we could decide the sufficiency without hearing more about what may prove to be further disclosure. Well, you know, I believe maybe because I don't know exactly the content of the Brady, I couldn't answer fully that question, but I believe that already the record shows insufficiency. Maybe there can be more in the Brady that can help. Go ahead, please. On the issue of the Carrasquillo notes, it's very important in Mr. Collazo's case because the only two witnesses that incriminate him mention that they went to his place of business to give him cash in a box. But that testimony is not included in Carrasquillo's notes. So in Collazo's case, Carrasquillo's notes are more important because that was basically the only incriminating testimony or the most damaging, where both witnesses say that they went to take cash to him. So that's not a Rule 29 argument. Correct. I just wanted to continue on the caution issue. But now to the Rule 29. There is not a single mention of any discussion involving Collazo or in front of him or any circumstantial evidence that could be argued that he knew that what he was allegedly doing was in furtherance of a conspiracy to distribute narcotics. You could argue that there may be weak but some evidence about unlawful activity, knowledge that he knew that the money could have known or should have known that it was the product of unlawful activity. But particularly drug distribution. There's nowhere near anything having to do with drug distribution. Are you conceding that he knew that there was money in the box? That's what the witness testified, that there was money in the box, both witnesses. And you're conceding that? That there was money in the box. According to them, it's taken as proof of the Rule 29. But nobody said that Collazo knew it was money from drugs. And there is no peripheral or circumstantial evidence placing him, Collazo, anywhere near drugs or drug conversation or nowhere near. Was there drug activity established by the government that drug activity was taking place in that location? No, Your Honor. Only they brought the press. Thank you for the answer, that's all. Thank you, Your Honor. Mr. Moraza? Yes. The same question. Yes, Your Honor. My issue is independent from the Brady issue. Of course, due to time constraints, I would argue the Rule 29 issue, the sufficiency of the evidence, the lack of knowledge that was not shown, that Rocky knew that the presence of drugs inside the boxes, that evidence was not present. And that's an essential element to demonstrate that he knowingly participated in a drug conspiracy. Of course, in my brief, I have that Rocky was deprived of a fair trial. And I presented all the reasons in my brief. But due to time constraints, I will limit it to the Rule 29 issue. Thank you. Good morning. Good morning. This is Manuel Moraza Ortiz on behalf of Rocky Martinez-Negron. I would like to reserve a minute for rebuttal. Government has failed to prove that Rocky knew he possessed a controlled substance with intent to distribute. Mr. Martinez also contends he was deprived of a fair trial. Due to time constraints, I will argue the knowledge issue. But I will gladly answer questions regarding other issues. Government's case rested on the testimony of two snitches, Diego Perez-Colón and Jorge Luis Figueroa Agosto. That was in the case of Rocky. Figueroa never testified against my defendant. Inexplicably, Diego and Jorge Luis' sentencing was delayed for more than four and a half years. Rocky worked at Ismael Luna Archival, a.k.a. Maero Auto Parts Business, a co-defendant in this case that pled guilty. Diego stated that things referring to controlled substances were delivered in boxes because they resembled auto parts were delivered in boxes. Prosecutor asked Diego, how could Diego be certain that Rocky knew he was dealing with drugs? Diego answered, because I ran out of kilos. I would tell Luis and Luis would tell Maero, then Maero would call me and tell me to go to his employee's house to pick the kilos. Communication with Rocky was limited to, this is the box. The snitches never said that the boxes were open in Rocky's presence. Jorge Luis mentioned six. What kind of boxes are these? Are these money or drugs in auto part boxes or just plain old round boxes? Well, the snitches, they were very vague about that. They say that they were delivered in boxes. They don't describe the boxes? No, they don't describe it because they resemble auto parts. So they're saying it was auto parts boxes? Well, they said they were boxes, but they used boxes because Rocky worked at an auto part business that was owned by Maero, and Maero was a condefendant in this case. Maero was the one who pled guilty before. I'm trying to think of the name of the case, which I said twice. It starts with an A, involving a gentleman from, I think, Nigeria, who was delivering a briefcase containing money. And we held that that was under the circumstances. I'd better stop talking because I can't remember the exact finding, but it was very... We held that under the circumstances it supported the inference that he knew that there were drugs in a nondescript suitcase, a briefcase. Yes, but it cannot be inferred because the other evidence demonstrated that boxes... They never said that boxes were open in front of him. They presented a drug ledger with the names of the people participating in the conspiracy, but Rocky's name was not in the ledger. Communication was very limited with Rocky to say, this is the box. And when asked directly by the prosecutor, how could Diego say that Rocky knew that he was carrying drugs? His answer was very vague because he would talk to Luis, who was the other snitch, and Luis would talk to Maelo, and Maelo would call Diego and tell him to pick the box with Rocky. But that's not it. There was no communication regarding drugs between Diego and Rocky, or Luis or Rocky. This is the box. They were very vague describing that information. I believe there's a case that I commented on my brief of a person delivering boxes, and the decision was unfavorable to the defendant because the government did not show that the person had knowledge. And USC... I know my time is up. If I can finish... You can finish your sentence, yes. Under 21 USC 841-846, the government must prove beyond reasonable doubt that Rocky had knowledge that his alleged crime involved a controlled substance. And the burden is on the government. It's not on the defendant. They must say that the defendant knew that the boxes contained drugs, and that evidence... They were very vague about that. They don't present that evidence. Okay, thank you. Thank you. Mr. Goldman, good morning, and I'm asking you the same question. Thank you, Your Honor. I won't repeat it. I get you going by heart by now. I do. The government's position, Your Honors, is that this court, along the lines of what it did in Rosario Peralta, can elect to decide every issue in the case now, and then, depending on the result of the Brady litigation on remand, will dictate whether the defendants are ultimately entitled to a new trial on that issue or not. In Rosario Peralta, this court decided the sufficiency challenges, because were the evidence to be insufficient in those cases, there would be no need for the Brady remand. In this case, there would be, because only two of the defendants have raised sufficiency challenges. But in the government's view, this court can elect either, as I said, to decide everything now, and then the remand proceedings would take place, and whatever the district court decided, the parties would then respond to with respect to the merits of the Brady claim. But we do not believe that the remand order itself divests this court of any authority to decide any issue that's currently been raised by any of the defendants on appeal. Thank you. You may proceed. So, in your brief, you indicated that you had not provided the other side with information about these two cooperating witnesses, because an attorney in your office was no longer there, and that attorney had the information that you needed. It's been a while. I assume that you've spoken to that attorney by now, so I'm just wondering, why haven't you updated your disclosures? So, a couple of points in the response, Your Honor. The first is, I just want to make clear to the court, the government provided ample amounts of Brady and Gabriel material before trial. But what came up at Mr. Verstein Cruz's sentencing was, and this is for the first time, this idea that a couple of the cooperators were, in fact, signed up as confidential informants and perhaps had received some kind of benefit. Now, Your Honor, is – I don't even know what that means, ample. If there's more to provide, then obviously it's not ample. If it comes within the parameters of Brady or Giglio disclosures, obviously not ample. I mean, I don't know if you independently assessed whatever you found out and are now objecting to any further disclosures. No, no. But that's not an answer. It's ample. No, my point was only, I just want to make clear that this is a limited Brady concern that got raised. It's not as if there's a universe, a big universe of documents that we have. And that means it should be all the quicker. I'm sorry, Your Honor? And that means you should be all the more quick in closing the loop on this, which I think is Judge Thompson's question. Well, indeed, we are not objecting to further discovery at all. I can tell the Court we have not provided any information to the defendants with respect to their Brady claims, but I do want to remind the Court it was our motion to remand for precisely this purpose. Well, we appreciate that, but there's nothing that prevents you from just giving it to them. Because if you had given it to them in February, maybe we could have gone ahead with the appeal without having to do a remand. There's nothing there. Well, again, we took our cue from this Court's decision, Rosario Peralta, which makes quite clear, I think, that the proper place for a court to hear new facts is in the district court and not in this court. And that's why we moved this court for the limited Brady remand. You're missing the point. There's nothing that prevents you from providing them with the information. No, there is not. I would suggest to the Court that it is not at all clear at this point that there actually is more information to provide. Well, that goes back to my original question, which was you didn't know if there was more because the agent had left. And so I'm trying to figure out if you've contacted the attorney who supposedly has the missing information to determine if there's even a Brady issue. Because if he had said there's nothing, these people were not cooperators, then it would be a non-issue at this point. Well, they were definitely cooperators, just with respect to confidential information. But cooperators are not in the context of what you've disclosed here. So I can certainly, I feel comfortable representing as an officer to the Court that I have been in contact with colleagues in the U.S. Attorney's Office and law enforcement community. My understanding from my discussions with them is that, indeed, there is no further information that's subject to be disclosed under Brady or Gabriel. The reason, again, we did not make that assertion in our answering brief is precisely because, again, we took our cue from Rosario Peralta that this Court is not the proper place to develop the evidentiary record or, frankly, the lack of an evidentiary record. But, rather, the proper procedure is what this Court did in Rosario Peralta and what we asked this Court to do, which was to allow the parties in the District Court to develop this evidentiary record, to allow the District Court to make findings, the facts, and conclusions of law. And then the parties can, depending on the outcome and what the parties decide to do, come back to this Court seeking review of whatever Brady decision the District Court makes. I hope that I'm trying to be responsive to your questions. I'm happy to continue to try to do a better job if that would be useful to the Court. We're certainly not trying to dodge any Brady obligations that we have. We take those obligations seriously. And, again, that's why we thought that the best approach here is to allow the parties in the District Court to fully develop the record so the District Court can respond to the defendant's Brady claim. I would also say to the Court that I understand that the reason why this was not able to be fully developed in the District Court is because the government, because of some personnel moves, at least this is what the record shows, was unable to get the answer to the question about whether there was more there. That's obviously something that occasioned the need for the Brady remand. I'm not ducking that fact either, Your Honor. Thank you. You may proceed. Thank you, Your Honors. I will begin with the claim of prosecutorial misconduct with respect to the murder testimony. And in this respect, I think it's important to consider separate- Were you a trial lawyer, by the way? I was not, Your Honor. I was not involved in the District Court proceedings. I think it's important to consider the two separate murder testimony incidents separately. That is, on the one hand, the Colonel Gonzalez issue, and then secondarily, the Menorah issue. On the Colonel Gonzalez point, and again, I think it's important here to note that the frame that the defendants have put around their claim is a frame of prosecutorial misconduct. And in that respect, I think it is important, as Judge Thompson noted earlier, there was no clear pretrial order from the District Court foreclosing the government from eliciting testimony about the plan to murder Colonel Gonzalez. And I think the fact that there was no order is highly relevant to the fact, as we argue in our brief, that there was no prosecutorial misconduct in its initial elicitation of this testimony from Marrero Martel. Now, even putting that to the side, and even if this Court were to think that, in fact, there was some kind of misconduct there, the District Court sustained the defendants' objections to that and struck that part of Marrero Martel's testimony that referenced that the purpose of the trip was to murder the Colonel for cooperating with Dominican authorities. At that point in time, or following that, it was Marrero Martel who testified, again, on direct, that the purpose of the trip was to do a task. And that was permissible testimony. The District Court specifically allowed the government to elicit that it was for a task. The next reference to the fact that the purpose of the trip was to murder the Colonel came not from the government, but it came from Mr. Raymundo Hernandez on cross-examination the next day when he asked Marrero Martel, didn't you just say yesterday that the purpose of the trip was to murder the Colonel? At that point in time, the door had been reopened so that when Mr. Perez-Colón took the stand and he was asked questions that the purpose of the trip was to commit the murder, that was permissible given that Raymundo Hernandez had opened the door. And I would also note there was no objection by any defendant either to Mr. Raymundo Hernandez opening the door or to the examination of Perez-Colón on the issue of the purpose of the trip. And so I think all of this is highly relevant, not just to the fact that there's no error here, but also to the fact that there is no prejudicial error. Other factors I think that go toward, and again, this is assuming that the court were to find error, which we do not think there was. But looking to the prejudice inquiry, there are several considerations here that I think militate against there being prejudice. One is the fact that the jury unanimously acquitted three of the defendants, including Mr. Veresting Cruz on count one, the importation conspiracy count, and we cite cases from the Supreme Court and this court that go far toward showing that this kind of split verdict underscores the extent to which any prejudice was minimal in this context. The other point I would make with respect to the lack of prejudice is that at closing argument, the government, again, in keeping with the way the district court had viewed this, referenced that the purpose of the trip was to do a job. It was Raymundo Hernandez who referenced testimony that the purpose of the trip was to murder the colonel. I would say in the context of this area of law or human relations, a job usually could be interpreted to be murder or some serious crime. That may well be, Your Honor, but that was what the district court allowed the government to do, and there was no protest from any of the defendants. Oh, that's a different issue. To the extent that we could show that this was for a task. The other point I would make with respect to the non-prejudicial nature of any error with respect to the Colonel Gonzalez testimony is that there was ample evidence to support all four defendants' convictions that had nothing to do with this testimony. Indeed, Mr. Callejo-Rivera and Mr. Martinez-Negron were not implicated at all in any way with respect to the December 2009 trip to murder the colonel, and the district court instructed the jury that the jury was required to consider the evidence on each count as against each defendant separately. And so I think that instruction coupled with what the Supreme Court has called the almost invariable assumption of the law that jurors follow their instructions, I think goes all the way towards showing that those two defendants could not have been prejudiced. As to Mr. Raimundi-Hernandez, who was implicated in the December 2009 trip only insofar as he was involved in sending weapons ahead of the trip, there was ample evidence both that he was responsible for offloading the drugs when they arrived from the Dominican into Puerto Rico, and that he was part of providing security for the conspiracy's leaders. And with respect to Mr. Verstein-Cruz, there was ample testimony that he provided armed security for Mr. Torres-Estrada, who was one of the leaders of the drug trafficking organization. And so just sort of thinking about the Colonel Gonzalez issue, for all of those reasons, we think both there was no error, and if there was, there was no prejudice from that error. When you mention ample evidence and ample testimony, are you referring to the testimony of the two principal cooperating witnesses? So there were three cooperators. Each defendant was implicated by at least two of them. And then there was some law enforcement testimony that referenced, for example, Mr. Martinez-Agron was connected to Mayello, Mr. Luna Archival. So I take it that's a yes, in other words, the cooperating witness testimony was the ample testimony. That was, to be sure, the bulk of the government's testimony inculcating the defendants in this case. On the second of the murder issues, this is- So how is it appropriate for the trial court to have made the statement that it was irrelevant testimony with regard to what was going on when everyone was incarcerated? So we have a different reading of the record on that, Your Honor. There were two objections to this. So this was on the government's cross, and the government was asking questions of Mr. Davila. Now, this is, to be clear, not with respect to the second murder issue, but now this is the judicial misconduct issue. The government was asking questions of Davila Reyes as to the source of his drugs. He was involved in a separate drug conspiracy. Why was that even relevant? I take Your Honor's point that it's not immediately apparent to us, looking back at the record now, exactly what the relevance of that line of questioning was. But the defendant never got a ruling on that. Well, not specifically, to be sure. There were two objections that were raised. Neither one was a relevance objection. They were both overruled. The third time the government asked the question, there was a relevance objection, and this is when the district court made its comment, his testimony is also not relevant to this case. Our reading of the record is- Why isn't that prejudicial? Well, our reading of the record is that it's not at all clear that that was an overruling of the objection, but rather it is, I think, fair to read the record as that being sustaining the relevance objection. I think the best evidence of that is that, in fact, Davila Reyes never answered the question. The government never returned to the question. The district court never required Davila Reyes to answer the question. After the- so there's a colloquy about the source- Well, it's almost worse because he was asked three times, right? That's correct. And he evaded an answer to that three times. Well, it was ultimately overruled. I'm not sure that I would say he evaded the answer. There were objections that were overruled. We returned to the question. Then there's the relevance objection, and then there's the district court statement, his testimony is also not relevant to this case. The next thing that happens is Davila Reyes says, I was not a runner in that conspiracy. I was an enforcer, which, of course, is not responsive to the question that was posed to Davila Reyes about who was the source of his drugs. And so that's why I think it's fair to read the record as indicating that, in fact, the district court was agreeing with the defense counsel. And, in fact, the district court thought that what it was doing was agreeing with defense counsel because when the district court overruled the mistrial motion, it did so because, as it said, it was agreeing with counsel that this line of questioning from the government was not relevant. I'd like to go back to this Brady issue slightly. Yes, John. You say that if those Brady statements were evidence but produced, it wouldn't be helpful to the defendants. Did I understand you correctly? If I said that, I didn't mean to. If, in fact, the defendants, there was other Brady material that we have that should have been disclosed, that they were confidential informants and got some kind of benefit, maybe they got paid money or they got something that we never disclosed, there would be a question about whether that would be material in this case. And to be sure, if the district court finds both that there is something that was not disclosed and that it's material, that being that there's a reasonable probability that had it been disclosed, the outcome of trial would have been different, then the defendants, one or all, would be entitled to a new trial. Well, my real question is, assuming that there's nothing in there that is of help to the defendants, was the fact that they were confidential informants disclosed to the jury? No, and I'm not sure it's a fact. Isn't that enough to have a problem? Well, I quibble a little bit with the premise of your Honor's question. I'm not sure it's a fact at all that they were confidential informants. What was disclosed to the jury and what was the subject of repeated lines of direct and cross-examination and the subject of attack by the defendants at closing argument was that these cooperators were cooperating in the hope that they would receive some leniency in their own criminal cases and that, therefore, they should be disbelieved. The district court gave an instruction to the jury to consider the cooperator's testimony and name the cooperators by name, but with particular caution in light of their incentive to shade their testimony. So if there was something, and I'm not trying to quibble with your Honor's question too much, if there was something else out there, if they were confidential informants in other cases, if they got undisclosed benefits, then that would certainly trigger close scrutiny from the district court on the defendants' Brady claims. The record as it stands now does not provide any support. There's no evidence in the record that these cooperators were anything other than cooperators. There's no evidence in this record that the cooperators obtained any benefit beyond what was disclosed. What you're saying is just so odd because you started off by saying as an officer of the court, I can let you know that there isn't anything else essentially. What I feel more comfortable saying, Your Honors, as an officer of the court, it has been communicated to me by law enforcement and prosecutor colleagues that there's nothing else out there. There's no evidence, there's no affidavits from law enforcement officers or testimony from law enforcement officers that the cooperators were not confidential informants or that they did not obtain benefits beyond what was disclosed before trial. That, indeed, is the very thing that we expect to be developed in an evidentiary record in the district court on remands. So I feel comfortable representing to the court what I have been told. But because there's no actual evidence to point to, that's why I think the Brady remand is appropriate. So the question of whether they are confidential informants or not is still an issue? That has been unresolved. That's right. I'm going to go back. It's odd because this issue came up in February and maybe we should have dealt with it in February, but it came up in February and it's November and you're saying it's still unresolved. In the context of your office, I mean, your office knows, I would assume, whether they were or were not at this point. I think that's right. And we asked for a limited remand before even filing our brief. I know you did. So precisely because we thought one expeditious way of allowing the parties in this court to deal with this issue is to press pause on this case entirely, send it back to do the remand, let it come back up with supplemental brief. This was our proposal. You're confusing two things here. There's your unilateral obligation to produce stuff, and then there's fact-finding that may or may not be necessary, and we can't do that in a court below or do it. Your unilateral obligation to produce stuff, there's no reason at all to slow that down. And so we go back to if it was almost a year ago that you knew there was an issue, how could we be standing here today and the government can't say we fully checked it out and we can represent they were or they were not confidential informants? You don't need a fact-finding by anybody other than yourselves to tell us that. Well, I am comfortable representing to the court that I have been told that they were not confidential informants and did not obtain benefits. The defendants insist that they are. And so if we had tried to supplement the record, for example, or just asserted in our answering brief that they were not confidential informants and that they did not obtain benefits, there would be a disputed fact because the defendants maintain that they were. Well, that's fine. No one's contesting that if there's a disputed fact that the court needs to resolve it, but it just seemed that by now you would have talked to the lawyer who they say left your office and anyone else who might know, and you would be able to confidently say on behalf of the government, no, and we'll go to contest their allegations on remand. Well, that is what I mean to be asserting, and we will be contesting their Brady allegations on remand. And I'll take it a step further. There's nothing wrong with talking to the other side and saying, what information do you possibly have in your possession that we may not, so I can better explore this? Well, they represented in some of their filings on this issue that they were told by, that Mr. Verston Cruz's lawyer had been told by a defendant in an unrelated case that a couple of these cooperators were operating as confidential informants. That's the basis for their Brady claim. Again, having spoken with law enforcement colleagues and colleagues in the attorney's office, we believe that to be factually wrong. That's what I have been told. But again, going back to the Rosario Peralta, the fact that there was going to be, even if we had asserted that in our, for example, our answering brief in the most forceful of ways, there would still be a contested issue of fact, and so that's why it would have been appropriate, I think, to send it back to the district court for the Brady remand. We're not trying to avoid any of our obligations, and we are attentive to the fact, as we say in our brief, that our Brady and Giglio obligations are ongoing. And so whether it is requested or not, when we come into, when we learn that there is undisclosed Brady or Giglio material, we have to turn that over. My understanding from colleagues is that there is no information to be turned over. Are you going to discuss the court's decision not to allow the defendants to call one of the agents as a witness? I'm happy to address that, Your Honor. The district court's ruling with respect to Special Agent Carrasquillo was premised on the collateral impeachment rule. Before you get to the collateral impeachment rule, that doesn't even come up unless the defendants are allowed to use those notes to cross-examine, and if the witness denies that they made those statements, that's when the court makes the assessment. Do you agree with them that the court wouldn't even allow questioning based upon the notes? Well, what the court would not allow was parties to show the agent Carrasquillo's notes to witnesses. That's right. They certainly were allowed to use the notes as a basis of saying, didn't you say to Special Agent Carrasquillo beforehand X, Y, and Z? In fact, two of the cooperators admitted to having lied to Special Agent Carrasquillo several times in their interviews. Here's what concerns me. Look, the defense counsel did their work here. They went back and they actually asked the witnesses point blank, did you tell the following to Carrasquillo? And Carrasquillo's notes is showing they did, and they then denied, and one was with respect to delivery of drugs and the other was with respect to delivery of cash, centrally relevant issues given counts one and two in this case. And you've already agreed, there does seem to be agreement between the parties, that this is a case that turned very heavily and relied very heavily on the cooperating witnesses' testimony. So when they both say that they did not tell the agent something that's very relevant and they told them something different, how do you explain the defendant not being able to bring the agent on the stand, point to his notes and say, they darn well did tell me this, so they have therefore changed their story on material elements of the claim? Well, I think the answer to your Honor's question is implicated in the premise of it, and that's to be sure if the discrepancy that the defendants were trying to identify was a material, was a matter that is material to this case, then the collateral impeachment rule would be overcome. In this case, it's not overcome. And so we're only talking about two defendants, Mr. Raimundi Hernandez and Mr. Callaso Rivera. Mr. Raimundi Hernandez never at any time in the district court or in his opening brief identified a single specific thing that Special Agent Carrasquillo would have said that contradicts what a cooperator said, much less has he established that that would have related to a material rather than a collateral. He specifically asked Marrero whether he told Carrasquillo that he transported $4 million to Casa del Capo, and instead he denied it and said he transported $1.5 to $2.5 million to Capocano. So that's Mr. Callaso Rivera's claim. Unlike Mr. Raimundi Hernandez, Mr. Callaso Rivera has come forward with a couple of discrepancies. But again, even that discrepancy, we argue, is collateral because whether Callaso Rivera brought $1.5 to $2.5 million, as was specified to a trial, or $4 million, and whether he brought it to Capocano or to Casa del Capo in the Dominican Republic, the central inculpating fact is the same. He's bringing drug money to the Dominican Republic. If what the defendants wanted to establish by calling Special Agent Carrasquillo, just to give the court a different example. Yeah, but that doesn't make sense to me. The way you establish the lack of credibility of a witness is you – sure, the witness is saying your guy was delivering drugs. So you say, well, where was he delivering drugs? And he says, Town A. And then you find out that on a prior occasion he said Town B, and it was a different amount. That's how you attack the credibility of a cooperating witness. You show that he's obviously making up the story because he can't remember to keep it straight. I agree with that, Your Honor. But credibility, if the only purpose of raising the issue is to attack credibility, credibility is a collateral issue. And I would point the court, for example, to this court's prior decision in Catalan Roman. And that – if I may finish? Yes. In Catalan Roman, the issue was whether a – it was a premeditated murder charge, and the government witness testified that the victim was – had his hands up pleading for his life before he was shot. And the defendant wanted to call law enforcement officers to testify that the witness never said before trial that the victim had his hands up pleading for his life before trial. And a majority of this court held that that was barred by the collateral impeachment rule because there was ample other evidence of premeditation. That testimony, whether his hands were up or not, was not material to guilt or innocence in that case. It was only material to showing that there was a inconsistency in statements, perhaps, but that inconsistency was not material to guilt or innocence, and that's why a majority of this court held that the testimony was barred by the collateral impeachment rule. My time is up. I'm happy to answer any further questions. Otherwise, we would rest on our briefs and ask the court to affirm pending the briefing. Thank you. Thank you. Thank you, Your Honors. I believe I have one minute for remand. I'm sorry, for rebuttal. Not more than that. I apologize? Nothing. So on behalf of Mr. Veristein, I feel inclined to address some of these courts' questions about the limited remand and the issues that remain beyond the Brady issue. And one of the things that I have to point out is that it's not exactly correct that this issue of undisclosed agreement was exposed in February. The request began pretrial, and they became more insistent as we developed more information about the scope of undisclosed information, and when the trial judge ordered the government to respond as to whether there were undisclosed agreements, the government's response was that the request for confidential informant agreements are typically made pretrial, and the defense is not entitled to that information as a matter of law pursuant to Rule 16. So when the trial judge required an answer, none was given. And if I could just finish my thought very quickly, I believe that we have a futility problem here. The defense has made three post-trial motions for production of the Brady material, and the trial judge in this case has accepted the non-answer from the government, we still do not know if there are undisclosed agreements, and has declined to rule on those issues. And the procedure that was provided in Rosario Peralta is a procedure that this trial judge has repeatedly refused to implement. And for that reason, we assert that the limited remands in this case, at a very minimum, should be referred to a different trial judge and should be coupled with an order to compel. Thank you. It wasn't clear to me if the court didn't give you a response because it felt at some point that it had lost jurisdiction because of the appeal. Well, Your Honor, we would strongly agree with the government that the government's duty of inquiry and duty of production is ongoing. So the jurisdiction over the production issue should not have been affected by the notice of appeal. Well, that's two different issues, though. One involving the government's duty and then one involving the court's response. We do believe that the court was aware of the government's ongoing duty of inquiry and production and that it had jurisdiction to oversee the enforcement of those duties, which is all that the defense was asking at that time. And the purpose of those post-conviction motions were to be able to file a complete Rule 33 motion for a new trial based on the suppression of that information and to complete the issues for appeal in order to have an intelligent conversation with Your Honor. I understand that if we were to find the evidence insufficient, that would at least close things down for a couple of the defendants. But I didn't get a chance to ask you in terms of the other issues remaining on appeal and how intertwined they are with this Brady issue. Well, I believe that, to be frank, the Brady issue is, I think, the best example of the overlapping and complementary instances of prosecutorial misconduct and judicial misconduct that we've alluded to. However, it is separate and apart from the other issues that are currently ripe for review by this court, and we believe that the appropriate remedy for the issues that we've discussed today and the ones included in our brief is remand for a new trial anyway. So our opposition, our initial opposition to the government's request for a limited remand on only the Brady issue was simply an objection to holding in abeyance the adjudication of those outstanding issues. If, in fact, there is going to be a new trial, we believe very strongly that Mr. Veristein should have the benefit of the suppressed Brady information to use effectively in furtherance of his defense theory. But we do not believe that it is necessary to, A, hold in abeyance these outstanding appeal issues, or, B, limit the remand to the issue, the question of whether, in fact, there is undisclosed Brady information. Pursuant to Rosario-Peralta, we know that that is actually a two-step inquiry. First, there has to be production of that material and then an evaluation of its materiality and whether, in fact, it prejudiced defendants' ability to present a defense and whether it affected the outcome of the trial. And the purpose of briefing that issue is to demonstrate to this court that, of course, the suppressed information went to the heart of the defense theory, which is that these two cooperators who implicated Mr. Veristein were engaged in other cooperation agreements with the government in which they were working together to coordinate their cooperation. So I'm having some difficulty because if you take a look at, let me just call it the intrusion by the district court judge during cross-examination of the defense witnesses, I mean, the whole point, as you said, in the defense theory was the credibility of the cooperators. And so if there's something that's out there to attack the credibility, it just seems all intertwined. And I'm just trying to figure out, you have clarity that it should be unbundled. I just don't have the same clarity about the unbundling, which is why I think we're pressing it. I think, for example, Your Honor, it is correct to observe that the type of misconduct that we are complaining of with respect to the Brady issue is at work in the incident regarding Jason Davila. However, we also have provided the court with independent bases to warrant remand for a new trial. So if, for example, this court were to find that there was a structural error during jury selection because there was no opportunity to exercise challenges for cause, the remedy, the only remedy, is to remand the entire case for a new trial. And so what we are asking this court to do is to decide the other issues independently of the Brady issue, understanding that remand for a new trial is appropriate. And once that occurs, then we would ask this court to compel production of the Brady material and to assign this case to a different trial judge. Thank you. You brought up something that I had difficulty following. I couldn't understand why you're saying on the jury selection that you didn't have a chance to exercise challenges for cause. It wasn't clear to me the basis of that argument. And because, you know, clearly there's structural problems with the trial, yes, that automatic prejudice and automatic redress in the trial. But I couldn't figure out actually, since there was one challenge for cause, how you're making the argument that you didn't have a chance to do that. It was a procedural error that occurred during the jury selection process. We're not making any allegations, but it was an intentional decision by the trial judge to limit the jury selection process initially. However, once it was brought to his attention that there had not been any voir dire to elicit whether there were bases to challenge for cause prospective jurors or to exercise those challenges, the trial judge decided that he would not go back and that he was going to empanel the jury that had been selected based only on peremptory challenges. And the result, as you can see during the sidebar exchange that occurred, was defense counsel was entitled to- When the jury selected jurors, ask the general questions that the court always asks. Did the court give the attorneys an opportunity at that point to ask questions? No, Your Honor. Okay. And so we've got this panel that was initially questioned, and you're saying that at that point there was no invitation from the court to present challenges for cause? That's correct. And once defense counsel notified the trial judge that there had not been an opportunity to exercise challenges for cause, the trial judge denied the opportunity to do so at that point. That caused defense counsel to notify two examples of potential jurors that raised concerns about competency to serve, but also pointed out that the defense had not had the opportunity and neither had the judge to further inquire or to conduct the voir dire necessary to make that determination. And the reason that we know that that is what in fact occurred is the voir dire that was ultimately conducted in chambers, as to juror number one, didn't occur until the fourth day of trial. Those are questions that should have been asked of her before the jury was even empaneled. And on the fourth day of trial, once there was an opportunity to probe into her potential bias, defense counsel, of course, no longer had access to any of its peremptory challenges. But isn't this a responsibility of counsel? I mean, the juries are being called, and then if you suddenly find out you're doing peremptories, doesn't someone say, time out, we've got some further questions or we've got cause? Yes. And counsel didn't do that. Actually, with one witness, they did ask a question. In retrospect, it would have been advisable to bring it to the court's attention sooner. Advisable? Isn't it always done that way? Well, it is the custom to do challenges for cause and then peremptory challenges. The custom as in always. Yes, but our rule, our local rule specifically states that the trial judge has broad discretion to administer the jury selection process. And if for some reason he had elected to conduct peremptory challenges first. How can you do peremptories first? Because you want the information you get from the fore cause. Even if you didn't generate fore cause, you might have got fore half cause, and that half cause is what you rely on to use your peremptory. And that would, of course, have been our preference. So the court sitting there was how many defense counsel? Four. Four defense counsel, and they all seemed to just let's go on to the peremptories. It is correct that defense counsel deferred to the court at that moment. However, once it became apparent that the trial judge intended to empanel the jury without exercising or the opportunity to do challenges for cause, it was brought to his attention and he denied the request. Well, but the way they brought it to his attention, as I recall the record, they said they wanted to do fore cause for the entire jury pool, not just any reduced segment of it. Well, that, again, that would have been defense counsel's preference. But what was. Well, of course he said no to that. To that. But that was what was put before him. What was also put before him was that we had not exercised challenges for cause in this case and that we were about to empanel a jury in which challenges for cause had not been exercised at all. And because that is exactly 50% of the procedural safeguards that exist to ensure that an impartial and competent jury is empaneled, we submit that it was a structural error that requires new trials. And, Your Honors, that's only by way of example. Because there are any number of issues that this court could rely on in order to remand this case for a new trial, which I believe is the original question about what to do with this limited remand as to the Brady issue. Thank you. I would like to give the government the opportunity, even though they haven't asked for it, to respond to this jury issue question. Thank you, Your Honor. Thank you for the opportunity, Your Honor. With respect to the voir dire issue, I think one of the main points here is that, with the exception of the untimely motion to challenge Juror 1 for cause, there is not a single thing the district court did during voir dire that any defendant objected to. And the only things the defendant asked for, the district court did. And so the district court asked a number of questions of the veneer designed to suss out any partiality or any bias, questions about do you know any of the parties, the lawyers, have you ever been a victim of a crime, do you have family members working for law enforcement, is there any reason that you can't serve on this jury. At what point did they say, by the way, Your Honor, there have not been for cause challenges? So it was after the 12 jurors that were going to be seated were chosen and before they started the process of selecting the alternates, is when Mr. Verstein-Cruz raised this issue about for cause challenges. And I would note for the court. So why was that too late? The court said it's too late. Why would that have been too late given what counsel said is the local rule giving broad discretion? Why would that be? In other words, I think grappling with did it amount to a waiver? I mean, why was that too late? So there's two moments in time here that we're talking about, and I just want to be clear for the court that they're different. The first is this idea after the 12 jurors are chosen, before they start selecting the alternates, there's this issue of for cause challenges is first raised. The district court says, well, do you have any for cause challenges? And the defendants say, with the information we have, Your Honor, no, we don't. But we want to know more about the whole jury pool before we think we can exercise for cause challenges with respect to anyone in the box. And that's just not how for cause challenges work. It was after the parties start – I'm sorry, Your Honor. So they didn't say we need to have more information about the jurors in the box before we can figure out if we need to do for cause challenges for them. That's correct. They had already heard information about the jurors in the box and had not raised the for cause challenge. Then it was while the parties were selecting the peremptories, or it may have been at the moment they finished, Mr. Veristeen-Crews said, Your Honor, it has come to our attention that Juror 1's brother had retired from the 4th Division of the Police Department, and we would request to challenge her for cause. That's the thing that the district court said was too late. And I think it's important to note here that although the formulation that Mr. Veristeen-Crews used, it has come to our attention that, might suggest that there was some new piece of information that had come out. In fact, that's not the case. Juror 1 had said during her individual voir dire that her brother had retired from the 4th Division. Indeed, another juror, Juror 8, also said that he had a family connection to the Puerto Rico Police Department, and one of the parties, actually the record doesn't show which one, but exercised the peremptory on Juror 8. No one said anything with respect to Juror 1. And the other point I would make for the court is even if there was something that the district court should have done differently with respect to Juror 1, even if the district court should have heard the for cause challenge before trial, we know to a certainty that the for cause challenge would have been denied because the during trial voir dire established that Juror 1 was unbiased and impartial, and all four of the defendants expressed their satisfaction with the colloquy during trial and with Juror 1 staying on the jury. And so there really, not only is there no error here, but. At the point when the issue about Juror 1 was raised, did anyone have any more peremptory challenges to exercise? At the time that Juror 1 made the for cause challenge, the peremptories had been done. They were selecting the alternates. Now, did anyone have any left? No, they had all used their, I believe it's the case they had all used their peremptories. Because the point of getting to the for cause is you get folks off the for cause before you have to exercise your discretionary challenges. I agree with that, Your Honor. But I think the point that I want to make sure is clear is that even had the defendants made a timely for cause challenge to Juror 1, or even had the district court entertained the untimely for cause challenge, the for cause challenge would have been denied because Juror 1 was impartial and unbiased and the defendants were satisfied with her assertions of impartiality and lack of bias. And so there would have been no grounds to remove Juror 1 for cause. Had the defendants wanted to use a peremptory on Juror 1 based on the fact that she had a prior family connection to the Florida Division, the defendants certainly could have done so, just as they did with Juror 8. They just elected not to do so. The final point I want to make here is brief. The structural error here in this regard is the seating of a biased juror. That is, if a juror is actually biased, there is no question about whether the evidence was so strong that even an unbiased juror would have rendered a guilty verdict. That's not their complaint here. We know that they have already waived any challenge to Juror 1's lack of bias. Their claim is a voir dire with insufficient kind of claim. That is not a structural error. This Court has applied that at most it would be subject here to plain error review, given that no defendant at any time challenged the kinds of questions the District Court asked on voir dire or asked for anything beyond what the District Court did. And so their structural error claim is just that it doesn't fit with the claim that they're actually asserting was error. With that, I'm happy to otherwise rest on our knees or otherwise answer questions with respect to the voir dire Juror 1 issue. I just have one that can be answered, yes or no, I think, because I know my colleagues will move this along. Yes, Your Honor. Did the judge ever ask if anyone had a for-cause challenge of the 12? Yes. And if I can provide just a bit of context, it was after they had selected the 12 jurors before they moved on to the alternates, when Mr. Verstein-Crews said, Your Honor, we have not done anything about for-cause challenges, in the ensuing colloquy, the Court asked the defendants twice whether they had any for-cause challenges, and both times the defendants said, Your Honor, with the information we have, we do not. Thank you. Thank you, and thank you for the opportunity, Your Honor. Ms. Eshington, good morning again. Thank you. My time is short, so I just have really two points to make. When the government's case rests solely on the credibility of two cooperating witnesses, as Judge Kayada pointed out, inconsistencies between what they told law enforcement and what they testified to at trial are certainly not collateral impeachment. That is material facts. This is not impeachment about some unimportant fact. This is impeachment about what they claim were the defendants' activities in this drug trafficking organization. And the Naholi case, I think, in my reply brief is right on point there. Additionally, it is not true that my defendant, Mr. Raimundi, did not point out a specific example. On page 11 of my opening brief, I cite the questioning of Moreira Martel, and he was asked whether he testified at trial that my client delivered drugs to a person named Angel Ramirez, if I may just finish. Yes. And he was asked whether he gave that information to the agents previously. He strenuously testified that he did. And the defendant was not allowed to impeach him with Carrasquillo's notes, which have no indication that he gave that information. Thank you. Thank you. Yes. Very briefly, Manuel Moraza-Ortiz, on behalf of Rookie Martinez Negro. You're the one that was arguing about the boxes, right? Yes. Well, my law clerks have refreshed my memory with a case I had in mind. It is Yugas v. Azebuchi. Are you familiar with that case? No, Your Honor. Well, I think you better read it. I'll be glad to give you the citation. Yes, Your Honor. 564-3-59. I remember it, at least of the fact, because I just sent it. But it doesn't help you very much. Yes. Well, I was going to report on regarding the Bravia and the VDO issue and the credibility. Go ahead. Yes, Your Honor. Your Honor, the Bravia and the VDO issue came after we had filed our brief. So that's why it's not included. But we don't call the defendant's brief regarding to cover that issue. However, in terms of Rookie Martinez's deprivation of a fair trial, the issue of credibility that's intertwined with Bravia and VDO is directly related. For example, when Mrs. Mila Negron, Rookie's mother, was seated during cross-examination, the prosecutor was allowed to ask her about her opinion of Maelo after he pled guilty. And that was not covered in the direct examination. It was finally objected. It lacked some foundation. And that was very prejudicial to the defense witness who, if I may finish, Your Honor. Go ahead. Who was attacking precisely the credibility of the two defense witnesses who said that they delivered those boxes at Rookie's house where he lived with his mother, Your Honor. And that was a central part on her closing argument against Rookie. On that grounds, we are requesting a new trial. Also, Your Honor, she vouched for the credibility of Diego Perezcon, one of the two complainant witnesses who testified against Rookie, saying that if Diego would want to lie, she, I, would have said that Rookie's name was on the ledger and not Bucky's. That was Rookie and not Bucky. And that was on her closing. And that's very prejudicial. On that grounds, Your Honor, we are asking for a new trial for Rookie Martinez Negron. Thank you. Is there one more? Okay. Well, we're going to take a very brief break, so don't go too far.